1  Albert & Susan  Bryant
2  2560 Chapparal Drive
3  Melbourne  FL  32934

# FILED

UNITED STATES DISTRICT COURT   2010 SEP 13  AM 11: 42
MIDDLE DISTRICT OF FLORIDA   CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

**Albert & Susan  Bryant**

Plaintiff,

vs.

**Sun Trust Bank**

Defendant

Case # _____

6:10-cv-1360-Orl-18-DAB

ORIGINAL PETITION

7   Date: September 13, 2010

8   Comes now   Albert & Susan  Bryant , hereinafter referred to as "Petitioner," and

9   moves the court for relief as herein requested:

10                                          **PARTIES**

11   Petitioner is  Albert & Susan  Bryant , 2560 Chapparal Drive  Melbourne  FL 32934.

12   Currently Known Defendant(s) are/is: Sun Trust Bank,  CLSC-Orlando 7455 Chancellor Drive ,

13   Orlando , FL  32809, by and through its attorney.

14                                   **STATEMENT OF CAUSE**

15   Petitioner, entered into a consumer contract for the refinance of a primary residence located at

16   2560 Chapparal Drive  Melbourne  FL 32934, hereinafter referred to as the "property."

17   Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

18   predatory loan agreement with Defendant.

19   Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

20   crafted scheme intended to defraud Petitioner.

21   Defendants failed to make proper notices to Petitioner that would have given Petitioner warning

22   of the types of tactics used by Defendants to defraud Petitioner.

23   Defendants charged false fees to Petitioner at settlement.

ORIGINAL PETITION                                                    1 of 22

24                                                **IN BRIEF**
25                              *(Non-factual Statement of Posture and Position)*

26   It is not the intent of Petitioner to indict the entire industry. It is just that Plaintiff will be
27   making a number of allegations that, outside the context of the current condition of the real
28   estate industry, may seem somewhat outrageous and counter-intuitive.

29   When Petitioner accuses ordinary individuals of acting in concert and collusion with an
30   ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
31   unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
32   people, just doing what they have been trained to do, are out to swindle the poor
33   unsuspecting borrower.

34   The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
35   committed by people acting in concert and collusion, one with the other. Petitioner has no
36   reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
37   that what they were doing was part of an ongoing criminal conspiracy, only that it was,
38   and they, at the very least, kept themselves negligently uninformed of the wrongs they
39   were perpetrating. Petitioner maintains the real culprit is the system itself, including the
40   courts, for failure to strictly enforce the consumer protection laws.

41                        **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
42                              *(General State of the Real Estate Industry)*

43      ***THE BEST OF INTENTIONS***

44   Prior to the 1980's and 1990's ample government protections were in place to protect
45   consumers and the lending industry from precisely the disaster we now experience.
46   During President Clinton's administration, under the guise of making housing available to
47   the poor, primary protections were relaxed which had the effect of releasing the
48   unscrupulous on the unwary.

49   Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
50   the risk. Consequently, Americans were engaged in safe and stable home mortgages.
51   With the protections removed, the unscrupulous lenders swooped in and, instead of
52   making loans available to the poor, used the opportunity to convince the unsophisticated
53   American public to do something that had been traditionally taboo; home buyers were
54   convinced to speculate with their homes, their most important investment.

ORIGINAL PETITION                                                              2 of 22

55   Sun Trust Bank, Ameriquest, Countrywide, and many others swooped in and convinced
56   Americans to sell their homes, get out of their safe mortgage agreements, and speculate
57   with the equity they had gained by purchasing homes they could not afford.  Lenders
58   created loans intended to fail as, under the newly crafted system, the Lender profited more
59   from a mortgage default than from a stable loan.

60   Companies cropped up who called themselves banks when, in fact, they were only either
61   subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
62   creating and selling promissory notes.  As will be demonstrated, these companies then
63   profited from the failure of the underlying loans.

64   ***HOW IT WORKS***

65   Briefly, how it works is this, the Lender would secure a large loan from a large bank,
66   convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
67   investor.

68   People would set up mortgage companies buy securing a large loan from one of the major
69   banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
70   an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
71   lender who would secure the title from the seller using the borrowed bank funds for that
72   purpose, and then trade the title to the buyer in exchange for a promissory note.

73   The lender then creates a 20 or 30 year mortgage with money the lender must repay within
74   6 months.  As soon as the closing is consummated, the promissory note is sold to an
75   investor pool.

76   The lender signed over the promissory note to the investor at the time of the trade, but did
77   not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme
78   Court addressed this issue and stated that such a transaction was certainly legal.  However,
79   it created a fatal flaw as the holder of the lien document, at time of sale of the security
80   instrument, received consideration in excess of the lien amount.  Since the lien holder
81   received consideration, he could not be harmed.   Therefore the lien became an
82   unenforceable document.

83   This begs the question: if keeping the lien would render it void, why would the lender not
84   simply transfer the lien with the promissory note?  The reason is because the lender will
85   hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full

86     amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
87     liability. The lender, by this maneuver, gets consideration a second time. And still the
88     lender is not done profiting from the deal.

89     After sale of the promissory note, the lender remains as the servicer for the investor. The
90     lender will receive 3% of each payment the lender collects and renders to the investor
91     pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep
92     that amount. Also, if the loan defaults, the lender stands to gain thousands for handling the
93     foreclosure.

94     The lender stands to profit more from a note that is overly expensive, than from a good
95     stable loan. And where, you may ask, does all this profit come from? It comes from the
96     equity the borrower had built up in the home. And still the lender is not finished profiting
97     from the deal.

98     Another nail was driven in the American financial coffin when on the last day Congress
99     was in session in 2000 when restrictions that had been in place since the economic
100    collapse of 1907 were removed. Until 1907 investors were allowed to bet on stocks
101    without actually buying them. This unbridled speculation led directly to an economic
102    collapse. As a result the legislature banned the practice, until the year 2000. In 2000 the
103    unscrupulous lenders got their way on the last day of the congressional session. Congress
104    removed the restriction banning derivatives and again allowed the practice, this time
105    taking only 8 years to crash the stock market. This practice allowed the lender to profit
106    further from the loan by betting on the failure of the security instrument he had just sold to
107    the unwary investor, thus furthering the purpose of the lender to profit from both the
108    borrower (consumer) and the investor.

109    The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
110    bailout at the expense of the taxpayer. The unsuspecting consumer was lulled into
111    accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
112    were acting under the guise of government regulation and, therefore, the borrower had
113    reason to expect good and fair dealings from all. Unfortunately, the regulations in place to
114    protect the consumer from just this kind of abuse were simply being ignored.

115    The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
116    the referral of the client to the lender by a person acting as an agent for the borrower.
117    Hereinafter, the person or entity who receives any portion of the yield spread premium, or

118    a commission of any kind consequent to securing the loan agreement through from the
119    borrower will be referred to as "Agent." The fee, authorized by the consumer protection
120    law is restricted to 1% of the principal of the note. It was intended that the Agent, when
121    seeking out a lender for the borrower, would seek the best deal for his client rather than
122    who would pay him the most. That was the intent, but not the reality. The reality is that
123    Agents never come away from the table with less than 2% or 3% of the principal. This is
124    accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
125    fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
126    product than the borrower qualifies for. This will generate more profits for the lender and,
127    consequently, for the Agent.

128    It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
129    the fair market price. This allows the lender to increase the cost of the loan product and
130    give the impression that the borrower is justified in making the purchase.

131    The lender then charges the borrower an underwriting fee in order to convince the
132    borrower that someone with knowledge has gone over the conditions of the note and
133    certified that they meet all legal criteria. The trustee, at closing, participates actively in the
134    deception of the borrower by placing undue stress on the borrower to sign the large stack
135    of paperwork without reading it. The trustee is, after all, to be trusted and has been paid to
136    insure the transaction. This trust is systematically violated for the purpose of taking unfair
137    advantage of the borrower. The entire loan process is a carefully crafted contrive
138    connivance designed and intended to induce the unsophisticated borrower into accepting a
139    loan product that is beyond the borrowers means to repay. With all this, it should be a
140    surprise to no one that this country is having a real estate crisis.

141                 **PETITIONER WILL PROVE THE FOLLOWING**
142    Petitioner is prepared to prove, by a preponderance of evidence that:

143    •   Lender has no legal standing to bring collection or foreclosure claims against the
144       property;

145    •   Lender is not a real party in interest in any contract which can claim a collateral
146       interest in the property;

147
148
149

- even if Lender were to prove up a contract to which Lender had standing to enforce against Petitioner, no valid lien exists which would give Lender a claim against the property;

150
151
152
153
154
155
156
157
158
159
160

- even if Lender were to prove up a contract to which Lender had standing to enforce against Petitioner, said contract was fraudulent in its creation as endorsement was secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in the inducement, fraud in the execution, usury, and breaches of contractual and fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of Pooled Assets," "Trustee or officers of Structured Investment Vehicle," "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of 'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans pooled together in a trust fund;

161
162
163

- Defendants have concocted a carefully crafted connivance wherein Lender conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property by inducing Plaintiff to enter into a predatory loan inflated loan product;

164
165

- Lender received unjust enrichment in the amount of 5% of each payment made late to Lender while Lender and Lender's assigns acted as servicer of the note;

166
167
168

- Lender and Lender's assigns, who acted as servicer in place of Lender, profited by handling the foreclosure process on a contract Lender designed to have a high probability of default;

169
170

- Lender intended to defraud Investor by converting the promissory note into a security instrument and selling same to Investor;

171
172
173
174
175

- Lender intended to defraud Investor and the taxpayers of the United States by withholding the lien document from the sale of the promissory note in order that Lender could then hold the lien for three years, then prepare and file Internal Revenue Form 1099a and falsely claim the full lien amount as abandoned funds and deduct same from Lender's income tax obligation;

176
177

- Lender defrauded backers of derivatives by betting on the failure of the promissory note the lender designed to default;

ORIGINAL PETITION                                                      6 of 22

178       • participant Defendants, et al, in the securitization scheme described herein have

179         devised business plans to reap millions of dollars in profits at the expense of

180         Petitioner and others similarly situated.

181                **PETITIONER SEEKS REMEDY**

182  In addition to seeking compensatory, consequential and other damages, Petitioner seeks

183  declaratory relief as to what (if any) party, entity or individual or group thereof is the

184  owner of the promissory note executed at the time of the loan closing, and whether the

185  Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory

186  Injunction requiring re-conveyance of the subject property to the Petitioner or, in the

187  alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

188  *PETITIONER HAS BEEN HARMED*

189  Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

190  Such harm and detriment includes economic and non-economic damages, and injuries to

191  Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

192  In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the

193  equitable relief requested herein is granted.

194                **STATEMENT OF CLAIM**

195  *DEFENDANTS LACK STANDING*

196      **No evidence of Contractual Obligation**

197  Defendants claim a controversy based on a contractual violation by Petitioner but Defendants

198  have failed to produce said contract.  Even if Defendants produced evidence of the existence of

199  said contract in the form of an allegedly accurate photocopy of said document, a copy is only

200  hearsay evidence that a contract actually existed at one point in time.  A copy, considering the

201  present state of technology, could be easily altered.  As Lender only created one original and that

202  original was left in the custody of Lender, it was imperative that Lender protect said instrument.

203  In as much as the Lender is required to present the original on demand of Petitioner, there can be

204  no presumption of regularity when the original is not so produced.   In as much as Lender has

205  refused Petitioner's request of the chain of custody of the security instrument in question by

ORIGINAL PETITION                                  

206   refusing to identify all current and past real parties in interest, there is no way to follow said
207   chain of custody to insure, by verified testimony, that no alterations to the original provisions in
208   the contract have been made.     Therefore, the alleged copy of the original is only hearsay
209   evidence that an original document at one time existed.   Petitioner maintains that, absent
210   production of admissible evidence of a contractual obligation on the part of Petitioner,
211   Defendants are without standing to invoke the subject matter jurisdiction of the court.

212        **No Proper Evidence of Agency**

213   Defendants claim agency to represent the principal in a contractual agreement involving
214   Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
215   pronouncement that agency has been assigned by some person, the true identity and capacity of
216   whom has not been established.   Defendants can hardly claim to be agents of a principal then
217   refuse to identify said principal.   All claims of agency are made from the mouth of the agent with
218   no attempt to provide admissible evidence from the principal.

219   Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
220   court.

221        **Special Purpose Vehicle**

222   Since the entity now claiming agency to represent the holder of the security instrument is not the
223   original lender, Petitioner has reason to believe that the promissory note, upon consummation of
224   the contract, was converted to a security and sold into a special purpose vehicle and now resides
225   in a Real Estate Mortgage Investment Conduit (REMIC)    as defined by the Internal Revenue
226   Code and as such, cannot be removed from the REMIC as such would be a prohibited
227   transaction.     If the mortgage was part of a special purpose vehicle and was removed on
228   consideration of foreclosure, the real party in interest would necessarily be the trustee of the
229   special purpose vehicle.   Nothing in the pleadings of Defendants indicates the existence of a
230   special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
231   cause to believe defendant is not the proper agent of the real party in interest.

232   *CRIMINAL CONSPIRACY AND THEFT*

233   Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
234   a criminal conspiracy to defraud Petitioner.   Said conspiracy but are not limited to acts of

ORIGINAL PETITION                                                    8 of 22

235   negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
236   acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
237   Petitioner by Lender, which were then used to fund the improper payment of commission fees to
238   Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

239   ***AGENT PRACTICED UP-SELLING***

240   By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so
241   doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
242   that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose
243   Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to
244   Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
245   connivances, wherein Agent proactively made knowingly false and misleading statements of
246   alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
247   Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
248   a loan product offered by the Lender.  Said loan product was more expensive than Petitioner
249   could legally afford. Agent acted with full knowledge that Petitioner would have made a
250   different decision had Agent given complete disclosure.

251   ***FRAUDULENT INDUCEMENT***

252   Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
253   known, Petitioner could not afford in order to unjustly enrich Lender.

254   ***EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT***

255   Said more expensive loan product was calculated to produce a higher return when sold as a
256   security to an investor who was already waiting to purchase the loan as soon as it could be
257   consummated.

258   **Extra Commission for Late Payments**

259   Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
260   that Lender intended Petitioner would have difficulty paying.  The industry standard payment to
261   the servicer for servicing a mortgage note is 3% of the amount collected.  However, if the
262   borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.

263 Thereby, the Lender stands to receive more than double the regular commission on collections if
264 the borrower pays late.

### Extra Income for Handling Foreclosure

266 Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
267 on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
268 receives considerable funds for handling and executing the foreclosure process.

### Credit Default Swap Gambling

270 Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
271 default swap, commonly referred to as a derivative as addressed more fully below. Since Lender
272 designed the loan to fail, betting on said failure is essentially a sure thing.

### *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

274 Lender sold the security instrument after closing and received consideration in an amount in
275 excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
276 security instrument, Lender separated the lien from said security instrument, creating a fatal and
277 irreparable flaw.

278 When Lender received consideration while still holding the lien and said consideration was in
279 excess of the amount of the lien, Lender was in a position such that he could not be harmed and
280 could not gain standing to enforce the lien. The lien was, thereby, rendered void.

281 Since the separation of the lien from the security instrument creates such a considerable concern,
282 said separation certainly begs a question: "Why would the Lender retain the lien when selling the
283 security instrument?"

284 When you follow the money the answer is clear. The Lender will hold the lien for three years,
285 then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
286 the full amount from Lender's tax liability, thereby, receiving consideration a second time.

287 Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
288 lien to the holder of the security, however, the lien once satisfied, does not gain authority just
289 because the holder, after receiving consideration, decides to transfer it to someone else.

290   ***LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES***

291   Lender further stood to profit by credit default swaps in the derivatives market, by way of inside

292   information that Lender had as a result of creating the faulty loans sure to default.  Lender was

293   then free to invest on the bet that said loan would default and stood to receive unjust enrichment

294   a third time.  This credit default swap derivative market scheme is almost totally responsible for

295   the stock market disaster we now experience as it was responsible for the stock market crash in

296   1907.

297   ***LENDER CONSPIRED WITH APPRAISER***

298   Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the

299   purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary

300   duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of

301   inducing Petitioner to enter into a loan product that was fraudulent toward the interests of

302   Petitioner.

303   ***LENDER CONSPIRED WITH TRUSTEE***

304   Lender conspired with the trust Agent at closing to create a condition of stress for the specific

305   purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and

306   fully understand what was being signed.

307   The above referenced closing procedure was a carefully crafted connivance, designed and

308   intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty

309   to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner

310   did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure

311   as required by various consumer protection statutes.

312   ***DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES***

313   In the manner in which Defendants have carried on their business enterprises, they have engaged

314   in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.

315   (Deceptive Practices Act).

ORIGINAL PETITION                                                                11 of 22

316   Such conduct comprises a pattern of business activity within the meaning of such statutes, and

317   has directly and proximately caused Petitioner to suffer economic and non-economic harm and

318   detriment in an amount to be shown according to proof at trial of this matter.

319   *EQUITABLE TOLLING FOR TILA AND RESPA*

320   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be

321   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

322   Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*

323   *1601*, et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)

324   are subject to a one-year limitations period; however, such claims are subject to the equitable

325   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as

326   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986)*, the court held

327   that given the remedial purpose of TILA, the limitations period should run from the date of

328   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate

329   circumstances, suspend the limitations period until the borrower discovers or has reasonable

330   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*

331   *v. California, 784 F.2d 910, 915 9th* Cir. 1986).

332   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614*, the

333   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold

334   that such limitations period may be equitably tolled. The Court of Appeals for the District of

335   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

336   *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986)*, while the Seventh Circuit came to the

337   opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*

338   *Cir. 1997)*. District courts have largely come down on the side of the Seventh Circuit in holding

339   that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*

340   *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*

341   *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988)*. Importantly, the Ninth Circuit, as noted above, has

342   interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the

343   language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914*. While not

344   of precedential value, this Court has previously found both the TILA and **RESPA** limitations

345   periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*

346   *F.Supp.2d 1091*, (W.D. Wash. 2007). 1106-07.

347   The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
348   by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
349   existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
350   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
351   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
352   any wrongful conduct by the Defendants. Santa Maria. at 1178.

### *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING STANDARDS*

353   *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
354   *STANDARDS*

355   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
356   assets by, for example, providing W-2 statements, tax returns, bank statements, documents
357   evidencing title, employment information, and other information and documentation that could
358   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
359   ability to repay a particular loan over both the short and long term. Defendants deviated from and
360   disregarded these standards, particularly with regard to its riskier and more profitable loan
361   products.

362   **Low-Documentation/No-Documentation Loans.**

363   Driven by its desire for market share and a perceived need to maintain competitiveness with the
364   likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
365   documentation loan products, including the HARMs and HELOCs described hereinabove, and
366   began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
367   the already eased underwriting standards to the point of disregarding such standards. This
368   quickened the loan origination process, allowing for the generation of more and more loans
369   which could then be resold and/or securitized in the secondary market.

370   Defendants marketed no-documentation/low-documentation loan programs that included
371   HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
372   income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
373   confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
374   was to be roughly consistent with incomes in the types of jobs in which the borrower was
375   employed. When borrowers were requested to document their income, they were able to do so
376   through information that was less reliable than in a full-documentation loan.

ORIGINAL PETITION                                                              13 of 22

377   For stated income loans, it became standard practice for loan processors, loan officers and
378   underwriters to rely on www.salary.com to see if a stated income was reasonable. Such stated
379   income loans, emphasizing loan origination from a profitability standpoint at the expense of
380   determining the ability of the borrower to repay the loan from an underwriting standpoint,
381   encouraged the overstating and/or fabrication of income.

382   **Easing of Underwriting Standards**

383   In order to produce more loans that could be resold in the secondary mortgage market,
384   Defendants also relaxed, and often disregarded, traditional underwriting standards used to
385   separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
386   the base FICO score needed for a SISA loan.

387   Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
388   used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
389   loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
390   income ratios (the amount of monthly income compared to monthly debt service payments and
391   other monthly payment obligations.

392   With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
393   term financial circumstances, approving the loan based on the initial fixed rate without taking
394   into account whether the borrower could afford the substantially higher payment that would
395   inevitably be required during the remaining term of the loan.

396   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
397   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
398   rather than on the borrower's ability to afford the subsequent, fully amortized principal and
399   interest payments.

400   As Defendants pushed to expand market share, they eased other basic underwriting standards.
401   For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
402   allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
403   eased underwriting standards the Defendants also were encouraging consumers to go further into
404   debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
405   underwriting standards created the aftermarket supply they needed. As a result, the Defendants
406   made it easy for the unwary consumer to take on more debt than he could afford by encouraging

ORIGINAL PETITION                                                                    14 of 22

407   unsound financial practices, all the while knowing defaults would occur more and more
408   frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
409   standards.

410   Defendants knew, or in the exercise of reasonable care should have known, from its own
411   underwriting guidelines industry standards that it was accumulating and selling/reselling risky
412   loans that were likely to end up in default. However, as the pressure mounted to increase market
413   share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
414   underwriting guidelines. Such was the environment that loan officers and underwriters were,
415   from time to time, placed in the position of having to justify why they did not approve a loan that
416   failed to meet underwriting criteria.

417   **Risk Layering**

418   Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
419   loans with one or more relaxed underwriting standards.

420   Defendants knew, or in the exercise of reasonable care should have known, that layered risk
421   would increase the likelihood of default. Among the risk layering Defendants engaged in were
422   approving HARM loans with little to no down payment, little to no documentation, and high
423   DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
424   the loans it promoted to borrowers.

425   Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
426   mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
427   believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
428   business ignored basic established underwriting standards and acted to mislead the borrower, all
429   to the detriment of the borrower and the consumer of loan products..

430   Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
431   engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
432   business practices described above in paragraphs 30-42 of this Complaint

433   ***UNJUST ENRICHMENT***

434   Petitioner is informed and believes that each and all of the Defendants received a benefit at
435   Petitioner's expense, including but not limited to the following: To the Agent, commissions,

ORIGINAL PETITION                                                        15 of 22

436    yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to

437    be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,

438    surcharges and other "back end" payments in amounts to be proved at trial; To the investors,

439    resale premiums, and high rates of return; To the servicers including EMS, servicing fees,

440    percentages of payment proceeds, charges, and other "back end" payments in amounts to be

441    proved at trial; To all participants, the expectation of future revenues from charges, penalties and

442    fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

443    By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,

444    and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly

445    deprived, and is entitled to restitution in the amount of $50000.

446    *CLAIM TO QUIET TITLE.*

447    Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and

448    the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title

449    interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission

450    and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

451    Defendants have no title, estate, lien, or interest in the Subject Property in that the purported

452    power of sale contained in the Deed of Trust is of no force or effect because Defendants' security

453    interest in the Subject Property has been rendered void and that the Defendants are not the holder

454    in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'

455    involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

456        "a Petitioner is entitled to damages from those Defendants who concur in the tortuous

457        scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*

458        *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*

459        *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*

460        *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*

461        *Rptr. 2d 752 (2d Dist. 1995).*

462    *SUFFICIENCY OF PLEADING*

463    Petitioner has sufficiently pled that relief can be granted on each and every one of the

464    Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond

465    doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would

ORIGINAL PETITION                                             

466  entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
467  allegations of material fact in the complaint are taken as true and construed in the light most
468  favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

469  Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
470  8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
471  theories, and seeks remedies to which Petitioner is entitled.  *Balistreri v. Pacifica Police Dept., 901 F.2d*
472  *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
473  conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
474  should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
475  Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
476  their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
477  relief as requested herein should be granted.

478                    **CAUSES OF ACTION**

479      ***BREACH OF FIDUCIARY DUTY***

480  Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
481  duty of care with respect to the mortgage loan transactions and related title activities involving
482  the Trust Property.

483  Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
484  breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
485  all applicable laws governing the loan transactions in which they were involved, including but
486  not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

487  Defendant's breaches of said duties were a direct and proximate cause of economic and non-
488  economic harm and detriment to Petitioner(s).

489  Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
490  all to be shown according to proof at trial of this matter.

491      ***CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE***

492  Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
493  duty to properly perform due diligence as to the loans and related transactional issues described
494  hereinabove.

ORIGINAL PETITION                                        17 of 22

495    In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
496    X and Z promulgated there under to, among other things, provide proper disclosures concerning
497    the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
498    or should have known that borrowers could not afford or maintain, and to avoid paying undue
499    compensation such as "yield spread premiums" to mortgage Agents and loan officers.

500    Defendants knew or in the exercise of reasonable care should have known, that the loan
501    transactions involving Petitioner and other persons similarly situated were defective, unlawful,
502    violative of federal and state laws and regulations, and would subject Petitioner to economic and
503    non-economic harm and other detriment.

504    Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
505    Z promulgated there under were intended and designed to protect, and the conduct alleged
506    against Defendants is the type of conduct and harm which the referenced statutes and regulations
507    were designed to deter.

508    As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
509    non-economic harm in an amount to be shown according to proof at trial.

510    *AGENT: COMMON LAW FRAUD*

511    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
512    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
513    ground for believing them to be true.

514    Agents made these representations with the intention of inducing Petitioner to act in reliance on
515    these representations in the manner hereafter alleged, or with the expectation that Petitioner
516    would so act.

517    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
518    in their negligent misrepresentation, and that various Agents were negligent in not implementing
519    procedures such as underwriting standards oversight that would have prevented various Agents
520    from facilitating the irresponsible and wrongful misrepresentations of various Agents to
521    Defendants.

522     Petitioner is informed and believes that Agent acted in concert and collusion with others named
523     herein in promulgating false representations to cause Petitioner to enter into the LOAN without
524     knowledge or understanding of the terms thereof.

525     As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
526     Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
527     opportunities, attorney fees and costs, and other damages to be determined at trial. As a
528     proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
529     suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
530     mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
531     at trial.

532     ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
533     ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

534     Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
535     fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
536     performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
537     *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
538     *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
539     *Jones, (2004) 33 Cal. 4th 917,* the court stated:

540     In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
541     particular significance, in part because of the special relationship between the insurer and the
542     insured. The insurer, when determining whether to settle a claim, must give at least as much
543     consideration to the welfare of its insured as it gives to its own interests. . . The standard is
544     premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

545     Likewise, there is a special relationship between an Agent and borrower. "A person who
546     provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
547     otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
548     consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
549     be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
550     *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
551     *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."

552   (California Department of Real Estate, *Section 8: Fiduciary Responsibility*, www.dre.ca.gov).
553   [*Emphasis Added*].

554   All Defendants, willfully breached their implied covenant of good faith and fair dealing with
555   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
556   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
557   product without regard for other more affordable products; (4) Placed Petitioner into a loan
558   without following proper underwriting standards; (5) Failed to disclose to Petitioner that
559   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
560   valid and /or properly documented substitutions and assignments so that Petitioner could
561   ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
562   request for documentation of the servicing of Petitioner's loan and the existence and content of
563   relevant documents. Additionally, Defendants breached their implied covenant of good faith and
564   fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
565   right under an alleged power of sale because the purported assignment was not recorded and by
566   willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
567   special relationship inherent in a real estate transaction between Agent and borrower, *and* all
568   Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

569   ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET***
570   ***SEQ***

571   Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
572   contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
573   Action as though the same were set forth herein.

574   Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
575   the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
576   Property, and entitles Petitioner to damages as proven at trial.

577   ***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***

578   The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
579   highly leveraged and vulnerable consumers who placed their faith and trust in the superior
580   knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
581   civilized society.

ORIGINAL PETITION                                                                 20 of 22

582 Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
583 distress, or acted in conscious and/or reckless disregard of the probability that such distress
584 would occur.

585 Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
586 conduct of Defendants as described hereinabove.

587 As a result of such severe emotional distress, Petitioner suffered economic and non economic
588 harm and detriment, all to be shown according to proof at trial of this matter.

589 Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
590 Petitioner and secure to Petitioner quite title;

591 Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
592 as payments to Defendants based on the fraudulently secured promissory note in an amount to be
593 calculated by Defendants and verified to Petitioner;

594 Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
595 amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
596 equal to $150,000

597                                    **PRAYER**
598 WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,
599 as follows:

600          For an emergency restraining order enjoining lender and any successor in interest from
601          foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth
602          herein;

603          For a permanent injunction enjoining Defendants from engaging in the fraudulent,
604          deceptive, predatory and negligent acts and practices alleged herein;

605          For quiet title to Property;

606          For rescission of the loan contract and restitution by Defendants to Petitioner according
607          to proof at trial;

608          For disgorgement of all amounts wrongfully acquired by Defendants according to proof
609          at trial;

610          For actual monetary damages in the amount $50,000.00.

ORIGINAL PETITION                                                    21 of 22

611     For pain and suffering due to extreme mental anguish in an amount to be determined at
612     trial.

613     For pre-judgment and post-judgment interest according to proof at trial;

614     For punitive damages according to proof at trial in an amount equal to $150,000.00 .

615     For attorney's fees and costs as provided by statute; and,

616     For such other relief as the Court deems just and proper.

617     **Respectfully Submitted,**
618
619
620     Albert Bryant                    Susan  Bryant

ORIGINAL PETITION                                                    22 of 22